931 So.2d 857 (2006)
Randy SCHOENWETTER, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-53.
Supreme Court of Florida.
April 27, 2006.
Rehearing Denied June 8, 2006.
*861 James S. Purdy, Public Defender and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Barbara C. Davis, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
Roger W. Yoerges, C. Boyden Gray, Edward C. DuMont, and Edward N. Siskel of Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, D.C., on behalf of MAAP Services for Autism and Asperger Spectrum, Dr. Fred Volkmar and Professor Anthony Bailey, for Amici Curiae.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court finding Randy Schoenwetter guilty of two counts of first-degree murder and imposing sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the convictions and sentences.

Procedural and Factual History
Randy Schoenwetter was indicted on August 29, 2000, for first-degree murder in the death of Virginia Friskey, first-degree murder in the death of Ronald Friskey, attempted first-degree murder of Haesun Friskey, and armed burglary of a dwelling. Before trial, Schoenwetter filed several pretrial motions, which included a motion to suppress statements and admissions, a motion to suppress evidence, and a motion to disqualify the trial judge. These pretrial motions were all denied. Schoenwetter wrote a letter to the court dated February 17, 2003, confessing his guilt and indicating that he wished to change his plea from not guilty to guilty. The trial court held a status hearing on February 26, 2003, where the defendant, against the advice of his attorneys to remain silent and after the trial court's cautionary instruction, advised the court that he did in fact write the letter and that he did wish to change his plea from not guilty to guilty. The defense attorneys advised the court that they intended to have the defendant evaluated later that week to determine his competency.
Prior to the entry of his plea on March 5, 2003, the defense attorneys advised the court that a psychologist had met with the defendant and had determined the defendant was competent. The defense attorneys also announced to the court that, against their advice, the defendant wished to enter a plea to all of the charges. The court conducted a plea colloquy, advising the defendant of the consequences of his pleas and the rights he would give up by entering the pleas. After the State established a factual basis for the pleas, the court found that the defendant entered his pleas knowingly, freely, and voluntarily, and with a full understanding that he could receive two death sentences.
A penalty phase proceeding before a jury was held from September 15, 2003, to September 25, 2003. The State presented testimony from fourteen witnesses, including Theresa Lathrop (daughter and sister of the victims), Haesun Friskey, (the victim of the attempted murder), Dr. Qaiser (medical examiner), Dr. Imani (medical *862 doctor), Ronald Larson and Denise Fitzgerald (two crime scene technicians), and Thomas House and David Butler (the investigating officers). The defense presented testimony from nine witnesses including Dr. Riebsame (forensic psychologist), Dr. Currie Prichard (neuropsychologist and clinical psychologist), Dr. Joseph Wu (clinical director of Brain Imaging Center), Deborah Roberts (mother of defendant), and Peter Siegel (expert on prison conditions).
The following facts were established during the penalty phase. At the time of the crimes, the Friskey family consisted of five people: the father, Ronald; the mother, Haesun; and the three children, Chad (eighteen years old), Theresa (sixteen years old) and Virginia, (ten years old). The defendant had known the Friskey family from childhood and attended the same karate school with the Friskey children. He was friends with Chad until Chad left for the Air Force a few months before the crime. Throughout his association with the family and before the crimes occurred, the defendant stayed overnight at the Friskey residence on a number of occasions.
On the night of August 11, 2000, Theresa Friskey had dinner with the family and went out until 11 p.m. Ronald, Haesun, and Virginia stayed home and watched television until they all fell asleep on the couch. By the time Theresa came home, they had all retired to their respective bedrooms.
At approximately 3 a.m. on August 12, 2000, the defendant left his apartment, where he lived with his mother. He rode his bicycle to the Krystal's Restaurant, where he was employed. After staying at Krystal's for a short time, he left on his bicycle and rode to the Friskey residence. According to the defendant's letter to the court confessing guilt, he decided to go to the Friskey residence so that he could force one of the Friskey daughters, Theresa, age sixteen, or Virginia, age ten, to have sex with him.
Schoenwetter arrived at the Friskey residence at approximately 5 a.m. He parked his bicycle on the back driveway of the residence and walked up to the back porch. He used a box cutter to cut open the screen and enter the porch. He then managed to push open the sliding glass door from the porch into the house just enough to slip through. There was a stick in the sliding door which only allowed the door to be opened twelve inches. After entering the house, he walked directly into the kitchen and armed himself with a large serrated kitchen knife from one of the drawers. He then walked down the hallway where the three bedrooms were located.
The first door he approached was to Theresa's bedroom; it was locked. He then peeked inside the bedroom on the opposite side of the hall and saw the parents asleep in their bed. He knew, based upon his previous overnight visits to the Friskey home, that the parents were heavy sleepers. He then entered Virginia's bedroom, which was directly across the hall from the parents' bedroom and next to Theresa's bedroom.
During his taped confession, Schoenwetter said he entered Virginia's room and began looking around. He said he never touched her body. While he was in her room, Virginia woke up and began to shriek. He put his hand over her mouth, threatened her with a knife, and told her to be quiet. She continued to shriek, she then recognized him, and said his name, Randy. He started to leave the room, but the mother came into the room and grabbed him. The father came into the room and tackled him. After struggling with the parents for a short time, he managed to break loose. Instead of leaving *863 the house, he decided to go back to Virginia's bed and kill her because she had recognized him and could identify him. He stabbed her on her bed. After he stabbed her, the father tackled him. He then struggled with both parents until he managed to break loose again. The defendant then left the house the same way he came in, got on his bike, and rode home. After he arrived home, he took a shower, placed his clothes, shoes, the box cutter, and the knife inside a blue plastic bag, placed the blue bag inside a trash bag containing trash from his apartment, and put the trash bag in the dumpster.
According to Haesun Friskey, she awoke when she heard Virginia whining. She walked over to the doorway to her bedroom, where she could see directly into Virginia's room. She saw Virginia lying in her bed with the defendant standing over her, touching her body. The defendant turned and looked at Haesun and then made a stabbing motion toward Virginia. Virginia made a sound like she was taking in air. Haesun could remember her husband struggling with the defendant. However, as a result of the trauma she suffered, she could not remember anything else that happened.
At some point during the struggle, Theresa Friskey, who was asleep in her locked bedroom, awoke and heard a commotion. She came to her sister's room, where she saw a pile of people on the floor. She heard a man, whom she believed to be her father, tell her to call 911. She went back to her bedroom and called 911. While she was on the phone, she looked out of her bedroom window and saw a man leaving the house covered in blood. She later learned that this man was her father.
After the defendant fled the Friskey residence, Ronald Friskey managed to get up, leave the house, and walk next door to Terry and Julie Blythe's home. He knocked on the window near the front door and called out, "Terry, help me." Julie Blythe called 911 and opened the door. She found Ronald Friskey slumped on the ground covered in blood. He told her that he had been stabbed, that his whole family was dead, and that a white male committed the crimes. He died in her arms as they were waiting for the paramedics to arrive.
When the police arrived at the scene, they observed a trail of blood leading away from the Friskey residence. An officer followed the blood trail and found that it led to an apartment complex at 215 Knox McRae Drive. Later that morning, Detectives House and Butler went to the apartment complex. While there, they spoke with a woman and a young girl who were outside to learn more about the apartment complex. The detectives explained to the woman their reason for being at the apartment complex. The woman identified herself as Deborah Roberts, stated that she knew the Friskey family, and said that her son and daughter were friends with the Friskey children. As they were talking, Schoenwetter left an apartment and walked towards them. One officer indicated that Schoenwetter was walking stiffly, as if he had been in a fight or an accident, and that he had a bandage on his thumb. Mrs. Roberts stated that he was her son, Randy Schoenwetter.
When Schoenwetter learned that the men were detectives, he appeared extremely nervous. The detectives asked Schoenwetter if he had a bicycle. He said that he did and showed Detective Butler his bicycle. After Schoenwetter left to show Detective Butler the bicycle, Detective House received a telephone call from Sergeant Esposito stating that they had found a size eleven deck or boat shoe print at the scene. Detective House asked Ms. Roberts if her son had any deck or boat *864 shoes. She said Randy had some deck shoes, and she had seen them the day before. When Schoenwetter returned, Detective House asked him where the shoes were. He said that he did not have them anymore because he had ruined them the other day and had thrown them out. The detective asked him if he would come to the police station with them for an interview. Schoenwetter agreed.
During the videotaped interview at the police station, Schoenwetter initially denied any involvement in the crimes. He then indicated how he would have committed the crimes had he been involved. He finally confessed to committing the crimes and gave the detectives a detailed statement.
The forensic evidence revealed Ronald Friskey died as a result of multiple stab wounds, including a stab wound to the eyebrow, forehead, left upper back, left middle back, middle back close to the spine, right lower back, right side of the neck, and three wounds to the right side of the chest. Ronald Friskey also had wounds on his right hand, which were consistent with defensive wounds. The wounds to the right side of the neck and the left middle back were life-threatening wounds, because they were very deep and caused extreme blood loss. The wound to the left middle back penetrated Ronald Friskey's lung.
It was determined that Virginia Friskey also died as a result of multiple stab wounds. One stab wound was inflicted to each side of her chest. The stab wound on the left was four inches deep and the one on the right was three inches deep. She also had a wound on each hand which entered the back of the hand and came out to the front of the hand. It appears that she was shielding her chest and that these wounds occurred at the same time as the chest wounds. The wounds to her chest penetrated her heart and both lungs. She also had wounds to her lip and to her lower jaw.
Haesun Friskey was stabbed multiple times but survived. She was in critical condition when she arrived at the hospital and had to undergo surgery to stop the bleeding in her liver and the bleeding on two parts of her arm. She suffered from massive blood loss and received 100 units of blood during her hospital stay. Dr. Emran Imani, the trauma surgeon who treated Haesun Friskey, testified that this was the equivalent of replacing her entire blood volume more than twenty times. He described her survival as miraculous, stating that she was expected to die when she arrived at the hospital.
The blood trail from the Friskey house that ended at Schoenwetter's apartment complex was proven by DNA testing to be that of Schoenwetter. His blood DNA was also found in Virginia Friskey's bedroom and in other locations inside the Friskey residence. The bags that Schoenwetter placed in the dumpster at his apartment complex, containing the clothes and shoes he was wearing during the crimes, the box cutter he used to cut the screen to enter the porch, and the knife he used to commit the murders, were subsequently found by law enforcement officers. The trial court noted that the defendant, in order to destroy or hide this evidence, placed these items into one bag, then placed this bag into a second bag, prior to putting it into the apartment complex dumpster. The defendant's shoes, socks, shirt, and shorts were tested for blood, and the blood found matched that of Ronald and Virginia Friskey. The large kitchen knife also tested positive for the blood of Ronald and Virginia Friskey. Schoenwetter's blood DNA was found on the handle of the knife.
On September 25, 2003, the jury recommended death for the murder of Virginia *865 Friskey by a vote of ten to two. The jury also recommended a sentence of death for the murder of Ronald Friskey by a vote of nine to three. On November 7, 2003, the trial court held a hearing pursuant to Spencer v. State, 615 So.2d 688, (Fla.1993). At the hearing the trial court heard from Jean Dees, Schoenwetter's grandmother, Pastor Dodzweit, and Deborah Rogers, Schoenwetter's mother. In addition, two victim impact statements were read into the record. The trial court, on December 5, 2003, entered its judgments and sentences, noting that the imposition of death is to be reserved for the most aggravated and least mitigated of crimes.[1] After consideration of all evidence presented, argument of counsel, the advisory verdict of the jury, the applicable elements of aggravation and mitigation as provided for by statute,[2] as well as the nonstatutory mitigating circumstances presented by the defense,[3] the court imposed sentences of death for the first-degree murders of Virginia Friskey and Ronald Friskey. The trial court sentenced Schoenwetter to life in prison for the attempted murder of Haesun Friskey, to run concurrent with the sentences for the two murders. A sentence of life in prison was imposed for the armed burglary of a dwelling, to run consecutive with the sentence for the attempted murder.
In support of the death sentences, the trial court found four aggravators applicable to each of the murders. Three aggravators, prior violent felony; murder committed during a burglary; and murder committed to avoid arrest, were found applicable to both murders. As to the murder of Virginia Friskey, the trial court also found the aggravator that the victim of the murder was less than twelve years old. The fourth aggravator applied to the murder of Ronald Friskey was heinous, atrocious or cruel. In mitigation, the trial court found applicable to both murders four statutory mitigators: no prior criminal history; extreme mental or emotional disturbance; lack of capacity to conform his conduct to the requirements of the law; and the defendant's age (eighteen) at the time of the crime. The trial court also considered and weighed eight of the nine nonstatutory mitigators argued by the defendant.[4]
The trial court further found that as to the two murders, each of the four aggravating circumstances standing alone outweighed all of the mitigating circumstances combined. This appeal followed. *866 Schoenwetter raises nine issues on appeal which we address below.

Discussion of Issues

MOTIONS TO SUPPRESS CONFESSION AND EVIDENCE
Schoenwetter contends the trial court erred in denying his pretrial motion to suppress his confession and the fruits thereof, and he contends the trial court erroneously concluded that he waived any rights to suppression of those issues during the penalty phase since he pled guilty to the crimes. We affirm the trial court's denial of the motion to suppress. "A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." Rolling v. State, 695 So.2d 278, 291 (Fla.1997) (citing McNamara v. State, 357 So.2d 410, 412 (Fla.1978)). Appellate courts should accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues. See Connor v. State, 803 So.2d 598, 608 (Fla.2001). Schoenwetter argued in his motion to suppress statements and admissions that his admissions should be suppressed because he was in custody during the interview and the detectives did not read him his Miranda[5] rights.

Custody/Arrest
Schoenwetter basically argues his statements should have been suppressed as involuntary because he was essentially arrested without probable cause and because he was not given proper Miranda warnings. In denying the motions to suppress, the trial court relied on evidence from Detective Butler, Officer House, and the videotape of the interrogation. The trial court found that Schoenwetter was not arrested but voluntarily consented to accompany the officers to the police station and that Schoenwetter was given Miranda warnings once he made incriminating statements. In addition, the trial court found that the defendant waived his rights in writing. We find the trial court's factual findings on these issues are supported by competent substantial evidence, and we affirm the trial court's conclusion that Schoenwetter's statements were voluntary. Thus, the trial court did not err in denying Schoenwetter's motion to suppress statements.
The trial court relied on this Court's opinion in Ramirez v. State, 739 So.2d 568 (Fla.1999), in reaching its determination that Schoenwetter was not in custody or otherwise arrested at the time he made his statements to the police. In Ramirez, we said:
A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest. "The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation."
Id. at 573 (citations omitted) (quoting Davis v. State, 698 So.2d 1182, 1188 (Fla. 1997)). We set out in Ramirez the following four factors for a trial court to consider in determining if a suspect is in custody: (1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; *867 (3) the extent to which the suspect is confronted with evidence of his or her guilt; and (4) whether the suspect is informed that he or she is free to leave the place of questioning. See id. at 574.
The facts of this case illustrate that Schoenwetter was not in custody. First, the detectives asked Schoenwetter if he would come to the police station to talk to them and he agreed, but stated he would have to be back by 4 p.m. to go to work. Moreover, Schoenwetter was not handcuffed and he was able to exit the car when they stopped for a snack. Second, the purpose of the interrogation was clear from Detective Butler's testimony that Schoenwetter appeared nervous, he had a cut on his hand, he was out and about on his bike the night before, and he knew the victims. Third, Schoenwetter was confronted with some evidence which implicated him in the murders. Detective Butler told Schoenwetter that there was a blood trail which led from the victim's house to his house and he had a cut on his hand. Also, Detective Butler stated that the person who committed the crime left on a bike. Fourth, Schoenwetter was not told he was under arrest. When he was asked during the interview if anyone ever told him he was under arrest, he responded, "No."
As did the defendant in Taylor v. State, 855 So.2d 1 (Fla.2003), Schoenwetter argues that he was under de facto arrest when he was taken to the police station and, therefore, he argues his subsequent confession to the detective about the burglary was the fruit of an illegal arrest. However, in Taylor, we did not find the defendant was under de facto arrest, because Taylor voluntarily agreed to accompany the officers to the station, he was not handcuffed during the ride, he was only handcuffed after arrival for safety purposes, and the officer explained that he was not under arrest. We said to find a defendant to be in custody, "it must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police." Id. at 17-18 (quoting Connor v. State, 803 So.2d 598, 605 (Fla.2001)). Similar to Taylor, Schoenwetter in this case voluntarily agreed to accompany the officers to the station when asked, rode in the back of the police car without handcuffs, and exited the car when officers stopped for a snack.
Under these circumstances, a reasonable person would not feel a restraint on his freedom or that he was not free to terminate the encounter. The trial court did not err in denying the motion to suppress.

Voluntariness
We disagree with Schoenwetter's arguments that his statements should have been suppressed because they were involuntary and obtained in violation of his constitutional rights. We have said that to establish that a statement is involuntary, there must be a finding of coercive police conduct. See Chavez v. State, 832 So.2d 730, 749 (Fla.2002). In Walker v. State, 707 So.2d 300 (Fla.1997), we said, "Where a defendant alleges that his statement was the product of coercion, the voluntariness of the confession must be `determined by an examination of the totality of the circumstances'" Id. at 311 (quoting Traylor v. State, 596 So.2d 957, 964 (Fla.1992)).
The totality of the circumstances present in this case demonstrates the defendant's statements to the police were voluntary. The trial court found that, while at home and in the presence of his mother and sister, Schoenwetter told the police he would go with them to the police station for questioning but wanted to be back in *868 time to go to work. He was taken to the police station without handcuffs and allowed to get out of the police vehicle when the officers stopped for a snack. Schoenwetter was not promised anything in exchange for a confession, and he was not deprived of food or water. He was not physically or verbally threatened or abused. Moreover, the trial court viewed the videotaped statement and indicated the videotape shows a mature young man who did not hesitate in his response to questioning and who seemed confident in the answers given.
Prior to the administration of the Miranda rights, the following dialogue occurred between Detective Butler and the defendant:
Q. Let, let, let me ask you this. Did, did you come to the station voluntarily?
A. You mean 
Q. Today?
A. Yes.
Q. Did anyone force you?
A. No.
Q. Did anyone tell you you was under arrest?
A. No.
Q. And you was willing to come down here and talk to me?
A. Yes.
Q. At any time, did anyone force you to tell me what happened?
A. No.
Q. You're doing this on your own free will?
A. Yes, sir, I am.
Q. Has anyone threatened you or anything like that?
A. No, sir.
Q. And you, and you just wanted to get this off your chest? Is that a yes or no?
A. Yes. Yes, sir.
We affirm the trial court's determination that the defendant made his admissions freely and voluntarily; Schoenwetter has not shown that the trial court erred in denying his motion to suppress statements and admissions.

Motion to Suppress Evidence
Schoenwetter also argues that the trash bag, clothing, knife, shoes, box cutter, and the blood drawn from him should be suppressed because these items are the fruit of the unlawful interrogation. Although the detectives first learned of the items in the dumpster during the defendant's interrogation, this evidence cannot be the fruits of the poisonous tree because the interrogation was not unlawful. As previously discussed, the trial court properly found the statements were made voluntarily and were not the product of unlawful police conduct. The items recovered from the dumpster were properly admitted into evidence. At both the beginning and the end of the interview, Schoenwetter agreed to have his blood drawn. His agreement was done during the same setting that his other statements were made. Thus, the trial court did not err in denying these aspects of the defendant's motion to suppress.
The record corroborates the trial court's detailed findings, and the motion to suppress confession and admissions as well as the motion to suppress evidence was properly denied by the trial court. The record reveals the trial court considered the different factors involved in determining whether the interrogation of the defendant was lawful. The trial court properly found that the defendant was never formally arrested or taken into custody by the police and, therefore, Miranda warnings were not necessary. See Correll v. State, 523 So.2d 562, 564 (Fla.1988). The trial court properly found that Schoenwetter was not *869 arrested until after he made the initial incriminating statements.
Additionally, Schoenwetter argues the trial court erred in holding that the issues raised in his motion to suppress were waived when he entered his guilty plea. While this was error, the trial court nonetheless correctly denied the motion. In Rolling v. State, 695 So.2d 278 (Fla.1997), the State argued that the issues raised in the defendant's motion to suppress were not properly raised on appeal because they did not survive the guilty plea. See id. at 288 n. 6. However, this Court said that the suppression issue was preserved as to the penalty phase of the trial and was correctly before it on review since Rolling objected to the admission of these statements and repeated his objection each time the evidence was introduced. Id. This Court in Rolling found no merit to the motion to suppress and affirmed the trial court's denial of the motion to suppress.
In this case, the defendant continued to object to the introduction of his statements and the evidence seized during the penalty phase, and the trial court overruled the objections. We affirm because, as in Rolling, there is no merit to the defendant's arguments that his statements were involuntary and that the evidence seized from the dumpster was the fruit of the poisonous tree.

VICTIM IMPACT EVIDENCE/MOTION TO WITHDRAW
Schoenwetter next argues the trial court erred in denying defense counsel's motion to withdraw. He further argues the trial court's rulings on the admissibility of the victim impact evidence, based on arguments made by Schoenwetter and not his attorneys, resulted in a denial of effective assistance of counsel. The trial court denied counsel's motion to withdraw and found the victim impact evidence admissible. The record supports these findings by the trial court; therefore the trial court did not abuse its discretion. We affirm the trial court's denial of relief.
Prior to the penalty proceedings, the defense attorneys filed motions challenging the victim impact evidence. During the penalty phase, the testimonies of three witnesses who would offer victim impact testimony were proffered to the court. During each proffered testimony, defense counsel objected but Schoenwetter interjected that the evidence should be allowed and that his attorneys should not object. The attorneys argued that the decision on whether or not to make objections rests with the attorneys and that Schoenwetter's comments should not be considered. After hearing the arguments of counsel and the defendant, the trial court noted that all objections were a part of the record and found the proffered evidence conformed to the requirements of the statute.
The standard applicable to a trial court's ruling on the admission of evidence is whether there has been an abuse of discretion. See Zack v. State, 911 So.2d 1190 (Fla.2005). The trial court's ruling will not be disturbed on appeal absent a clear showing of abuse. See Boyd v. State, 910 So.2d 167 (Fla.2005). It is clear from this record that the trial court did not abuse its discretion. Prior to the penalty phase, Schoenwetter pled guilty, over counsel's advice, to all of the offenses charged, including the two charges of first-degree murder. In an abundance of caution, the trial court allowed the defendant to address the court on the victim impact issue. Despite the fact that the trial court allowed the defendant to speak, the trial court's ruling on the admissibility of this evidence was based on the trial court's belief that the admitted evidence was admissible under section 921.141(7), Florida *870 Statutes (2000).[6] This is evident by the fact that after listening to the proffers, the trial court placed limitations on the testimonies of two of the victim impact witnesses.
In addition to the provision for this type of testimony in section 921.141(7), this Court has held that victim impact evidence is relevant even though it does not address any aggravating circumstance or rebut any mitigating circumstance. See Burns v. State, 699 So.2d 646, 653 (Fla.1997). Based on the facts of this case and the proffered victim impact evidence, the trial court properly admitted the testimonies of the three victim impact witnesses. See Kormondy v. State, 845 So.2d 41, 53 (Fla. 2003).
Based in part on the trial court's rulings on the victim impact evidence, defense counsel filed a motion to withdraw as counsel for Schoenwetter.[7] Defense counsel stated they would not have the defense controlled by Schoenwetter. The trial court denied the motion and in so doing noted that the rulings on the victim impact evidence were based on the fact that the evidence as limited was admissible under the statute. Moreover, the trial court attempted to alleviate any concerns by having the defendant evaluated despite the trial court's belief that no additional competency evaluation was necessary.
The trial court properly denied the motion to withdraw. This record does not demonstrate that the attorney-client relationship had deteriorated to the point where counsel could no longer give effective aid in the fair representation of the defense. See Wilson v. State, 753 So.2d 683, 688 (Fla. 3d DCA 2000). General loss of confidence or trust standing alone will not support withdrawal of counsel. See Johnston v. State, 497 So.2d 863, 868 (Fla. 1986).

WITNESS CONFRONTATION
Schoenwetter argues that the trial court erred in allowing a medical examiner who did not perform the autopsies to testify regarding his opinion as to cause and manner of death. He contends this testimony violated his right to confront the witness pursuant to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Schoenwetter also contends that the trial court erred in relying on Geralds v. State, 674 So.2d 96 (Fla. 1996), to allow the medical examiner to testify, because Dr. Qaiser admitted that he had only reviewed the records, photos, and other documents and talked to the medical examiner who actually performed the autopsy. The trial court did not abuse its discretion in allowing Dr. Qaiser to testify about the autopsies performed by Dr. Vasallo, where Dr. Vasallo was unavailable to testify, and Dr. Qaiser was a *871 qualified expert who had reviewed the autopsy reports, photos, and notes and had spoken with Dr. Vasallo.
This Court said in Ramirez v. State, 542 So.2d 352, 355 (Fla.1989), that the determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, and the trial judge's decision will not be reversed absent a clear showing of error. Section 90.704, Florida Statutes (2000), provides that an expert is permitted to express an opinion on matters in which the witness has expertise when the opinion is in response to facts disclosed to the expert at or before the trial. See also Capehart v. State, 583 So.2d 1009, 1012-13 (Fla.1991). Additionally, in Geralds v. State, 674 So.2d 96 (Fla.1996), this Court held it was proper to permit a medical expert to testify as to the cause of death, despite the fact that the expert did not perform the autopsy. In this case, Dr. Qaiser reviewed the medical files, the autopsy reports, and the whole chart, and discussed the case with Dr. Vasallo, who conducted the autopsies. Dr. Qaiser formed his opinion on the manner and cause of death on the basis of what he reviewed. The defense did not object to Dr. Qaiser's qualifications as an expert, and the court noted that Dr. Qaiser had testified as an expert in previous cases.
This case is similar to the situation we addressed in Capehart v. State, 583 So.2d 1009 (Fla.1991). In Capehart, the defendant objected to a medical examiner testifying at trial regarding the cause of death and the condition of the victim's body. However, this Court held that under section 90.704, a medical examiner may testify relying on facts or data not in evidence because such information was of a type reasonably relied upon by experts in the subject. This Court found the expert testimony was proper where the expert formed her opinion based upon the autopsy report, the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case. Capehart, 583 So.2d at 1013.
Schoenwetter's reliance on Crawford in arguing that the medical examiner's reports, notes, and statements were testimonial hearsay is misplaced. The record does not reflect any specific objection by counsel based on Dr. Qaiser's reliance on actual conversations with Dr. Vasallo (the medical examiner who did the autopsy) or based on Dr. Qaiser's quoting or testifying to anything specific that Dr. Vasallo related to him. There was no specific objection by defense counsel based on a confrontation violation; therefore, this issue has not been preserved for review.

MOTION FOR MISTRIAL
Schoenwetter contends the trial court erred in denying his motion for mistrial because the prosecutor deliberately misled the jury about appellant's lack of significant criminal history. Schoenwetter maintains that a mistrial was appropriate because a curative jury instruction was not sufficient to undo the damage. He further argues that the error was compounded by the erroneous consideration by the jury of Schoenwetter's possession of child pornography, of his conviction for retail theft, and of his contemporaneous convictions for attempted murder and armed burglary of a dwelling.
The record reflects the prosecutor addressed the jury in closing argument concerning the weight to be given to the aggravators and the mitigators. He told the jury they could consider the fact that the defendant had been previously or contemporaneously convicted for the other crimes charged in this case. After objection by the defense, the trial court found the statement could have been made in *872 error and was not necessarily misleading to the jury. Defense counsel's motion for mistrial was denied and a curative instruction was given. Schoenwetter agreed, without waiving his request for a mistrial, that the curative instruction could be read to the jury.
A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. See Goodwin v. State, 751 So.2d 537, 547 (Fla.1999). This Court has held that a trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review. Id. at 546. In this case, the prosecutor admitted the mistake, and the trial judge gave a curative instruction. The jury indicated that it understood the curative instruction. The giving of a curative instruction was sufficient to cure the error, and a mistrial in this instance was not required. See Anderson v. State, 863 So.2d 169, 186-87 (Fla.2003).
Further, to the extent Schoenwetter argues that erroneous consideration of his possession of child pornography may have compounded the error, it appears from the record that introduction of this issue was not attributable to the State but was raised instead by a defense witness, Dr. Riebsame. The doctor spoke of Schoenwetter's obsession with child pornography. The defense attempted to rebut the testimony by introducing evidence from Commander Mutter from the police department. Mutter testified that the images the child's mother brought to the police, images that Schoenwetter had downloaded, were not underage women. Because the images were not of underage children, no charges were filed.
We find that the trial court did not abuse its discretion in denying the motion for mistrial and any error was harmless because a curative instruction was given.

MOTION TO DISQUALIFY THE TRIAL JUDGE
Schoenwetter next argues the trial court erred in denying his motion to disqualify the trial judge.[8] The motion to disqualify was based on the fact that the trial judge was a former prosecutor whose office had prosecuted another case involving a Positron Emission Tomography (PET) scan and that the office opposed the use of PET scan evidence. The motion did not allege any other facts concerning this trial judge. The trial court denied the motion as legally insufficient. We find no error and affirm the denial of the motion.
In MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332 (Fla.1990), this Court explained that the standard for deciding if a motion to disqualify is legally sufficient is whether the facts as alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial. See also Correll v. State, 698 So.2d 522, (Fla.1997); Livingston v. State, 441 So.2d 1083 (Fla.1983). The motion to disqualify filed in this case does not meet this standard. The motion merely asserts that the trial judge was a former prosecutor and that his office aggressively opposed the use of PET scans. The rest of the affidavit makes allegations concerning other prosecutors or the prosecutors' office in general. Such generalizations fall short of the "specifically described prejudice or bias of the judge" required by Florida Rule of Judicial Administration 2.160(d)(1). Error on this issue has not been demonstrated.

*873 INFLAMMATORY PHOTOGRAPHS

Schoenwetter asserts that the trial court erred in admitting photographs of the wounds inflicted on the attempted murder victim because they were not relevant to any contested issue. He contends the photographs of the bloody but necessary work of the emergency room doctors impermissibly tipped the scales towards death in the jury's mind. Thus, he concludes, the photographs' probative value was substantially outweighed by their prejudicial effect, and therefore, the trial court erred in admitting the photographs into evidence. We disagree and affirm the trial court's ruling.
The admissibility of photographs of a victim is within the discretion of the trial court and will not be disturbed on appeal in the absence of abuse of that discretion. See Ruiz v. State, 743 So.2d 1 (Fla.1999). We have repeatedly upheld the admission of photographs when they are necessary, as in the instant case, to explain medical testimony, the manner of death, or the location of the wounds. See Davis v. State, 859 So.2d 465, 477 (Fla.2003)(finding photographs admissible where they were used to aid in explaining the examiner's testimony); Floyd v. State, 808 So.2d 175, 184 (Fla.2002)(finding two autopsy photographs that showed the victim's stab wounds admissible because they were relevant to show the circumstances of the crime and the nature and extent of the victim's injuries); Pope v. State, 679 So.2d 710, 713-14 (Fla.1996)(affirming the admission of autopsy photographs where they were relevant to illustrate the medical examiner's testimony and the injuries he noted). In this case, the trial court found the photographs were relevant because they showed the extent of the wounds inflicted on the victim by the defendant and depicted the medical intervention necessary to save the victim's life. These issues helped to put into context the actions of the defendant and his state of mind when both the fatal and nonfatal wounds were inflicted.
During the penalty phase, the State presented testimony from Dr. Eman Imani, one of the emergency room physicians who treated Mrs. Friskey upon her arrival at the hospital. The photographs were used to aid the doctor in explaining the extent of Haesun's injuries, and in explaining the steps taken to save her life, evidence relevant to the totality of aggravating circumstances. Pursuant to Davis and Floyd, the trial court carefully considered the photos before making its findings. The photographs were probative of and relevant to penalty phase issues, and were thus properly admitted. The trial court did not abuse its discretion in admitting the photographs.

AGGRAVATORS AND MITIGATORS
The defendant argues the death sentences imposed must be vacated because the trial court found improper aggravating circumstances, failed to consider (or gave little or no weight to) highly relevant and appropriate mitigating circumstances, and improperly found that the aggravating circumstances outweighed the mitigating factors. We affirm the sentences imposed in this case.

Witness Elimination/Avoid Arrest Aggravator
First, Schoenwetter argues it was error for the trial court to consider and to instruct the jury that one of the aggravating circumstances it could consider relating to the murder of Ronald Friskey was that the murder was committed to avoid arrest. He asserts that the evidence does not support this aggravator. In Preston v. State, 607 So.2d 404 (Fla.1992), we held that in order to establish this aggravating factor, where the victim is not a law enforcement officer, the State must show *874 that the sole or dominant motive for the murder was the elimination of the witness. Id. at 409. We additionally said that this factor may be proven by circumstantial evidence from which the motive for the murder may be inferred. Id. at 409 (citing Swafford v. State, 533 So.2d 270, 276 n. 6 (Fla.1988)). In Walls v. State, 641 So.2d 381, 390 (Fla.1994), we further held that a confession is direct evidence of motive and that a confession that witness elimination was the reason for the murder satisfies this aggravating circumstance.
In this case, the State presented evidence and the trial court found that the defendant confessed to the crimes, and in particular to stabbing and killing Virginia because she knew him. In his confession, Schoenwetter indicated he knew Virginia recognized him because she said his name, "Randy." He also said Virginia continued to shriek after he said he would not hurt her. Her shrieking brought the mother to the room. Therefore, knowing that he needed to escape and knowing Virginia was the only one who knew he was the intruder, he stabbed Virginia to conceal his identity. Thus, by his own words, Schoenwetter killed Virginia to eliminate her as a witness.
Other statements made by Schoenwetter support the finding that the murder of the father, Ronald Friskey, was to avoid detection and arrest. During his confession, Schoenwetter stated he was fighting with Ronald and swinging away with the knife, "trying to get Ronald off him." He said he was lashing out with the knife because he "didn't want to get caught or anything like that." Once the defendant was discovered, his primary focus was to avoid capture and get away from the Friskey house.
The trial court did not err in considering and allowing the jury to consider that the murder of Ronald Friskey was done to avoid arrest. The evidence amply suggests application of this aggravating circumstance to both the murders of Virginia and Ronald Friskey.

Heinous, Atrocious, or Cruel Aggravator
Schoenwetter next argues the heinous, atrocious, or cruel (HAC) aggravating circumstance does not apply to the murder of Ronald Friskey. We stated in Lynch v. State, 841 So.2d 362, 369 (Fla. 2003), that when we analyze the heinous, atrocious, or cruel aggravator, the focus is not on the intent of the assailant, but on the actual suffering caused to the victim. In determining whether the HAC factor was present, the focus should be upon the victim's perceptions of the circumstances as opposed to those of the perpetrator. See Farina v. State, 801 So.2d 44, 53 (Fla. 2001).
The record reflects and the trial court found that the HAC aggravator applied to Ronald Friskey. Ronald Friskey died an extremely torturous death. The medical examiner's testimony revealed Ronald was stabbed at least ten times. The wounds were on various parts of his body (including defensive wounds on his hands), he lost a lot of blood, and he had difficulty breathing. Ronald Friskey was alive and conscious throughout the attack as evidenced by the defendant's confession, and by the fact that Ronald lived long enough to drag himself next door to seek help and was able to state his belief that his entire family was killed. In addition to the physical torture he endured, Ronald was emotionally tortured by witnessing the defendant's attack on his ten-year old daughter and his wife.
The heinous, atrocious, or cruel aggravating circumstance is applicable to the murder of Ronald Friskey.

Weight Given to Mitigators
Lastly, Schoenwetter contends the trial court erred in the weight it accorded *875 to some of the mitigating circumstances.[9] In Campbell v. State, 571 So.2d 415 (Fla. 1990), this Court indicated that a trial court must find as a mitigating factor any factor reasonably established by the greater weight of the evidence and that is mitigating in nature. In Trease v. State, 768 So.2d 1050 (Fla.2000), we receded from Campbell "to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight." Trease, 768 So.2d at 1055. This Court also held in Kearse v. State, 770 So.2d 1119, 1133 (Fla. 2000), that deciding the weight to be given a mitigating circumstance is within the trial court's discretion, and that the trial court's decision will not be reversed except for an abuse of discretion. See also Blanco v. State, 706 So.2d 7, 10 (Fla.1997).
In this case, the trial court did not refuse to consider or weigh any mitigating evidence presented by Schoenwetter. On the contrary, the record reflects that the trial court found four statutory mitigating circumstances and numerous nonstatutory mitigating circumstances. The trial court found as statutory mitigating circumstances the defendant's age, lack of prior criminal history, impaired capacity, and extreme mental or emotional disturbance. In addition, the trial court considered and found as mitigating such factors as acceptance of responsibility, sexual preoccupation from an early age, lack of a threat to the general prison population, gainful employment, and loving relationship with his family.
The defendant, however, takes issue with the weight that was given to the four statutory mitigating circumstances, which were given little weight, and with the weight given to two of the nonstatutory mitigating circumstances.[10] Although Schoenwetter maintains these mitigating factors were not accorded the proper weight, he has failed to even argue, much less demonstrate, why the weight given by the trial judge was not appropriate under the facts of this case. The weight given to these mitigators lies within the discretion of the trial court, and there has been no showing that the trial court abused its discretion. Therefore, we find no error in the trial court's consideration of these mitigating factors.

Proportionality
In deciding whether death is a proportionate penalty, this Court considers the totality of the circumstances of the case and compares the case with other similar capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). However, this proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). The murders of Virginia Friskey and Ronald Friskey are supported by four aggravating circumstances. The trial judge found four statutory mitigating circumstances and several nonstatutory mitigating circumstances. Our review of the circumstances of this case supports the imposition of death for both murders.
This Court has upheld as proportional several cases with similar aggravating and mitigating circumstances. For example, in *876 Parker v. State, 873 So.2d 270 (Fla.2004), we held the death sentence was proportional where the trial court found five aggravators, including avoiding arrest and HAC, weighed against one statutory mitigator, that defendant was nineteen years old, and thirteen nonstatutory mitigators, including the defendant's cooperation with law enforcement and the defendant's abusive or deprived childhood. Likewise in Caballero v. State, 851 So.2d 655 (Fla. 2003), the death penalty was affirmed where four aggravators were found, including avoiding arrest and HAC, and six mitigators were found, including no significant prior criminal history and extreme mental or emotional disturbance.
As with this case, the trial court in Caballero found the aggravators were proven and that each of them, standing alone, would be sufficient to outweigh the six mitigating circumstances. See id. at 659 n. 2; see also Hertz v. State, 803 So.2d 629 (Fla.2001) (holding death penalty proportional in a double homicide where seven aggravators were found for each victim including avoid arrest, HAC, and murders during the course of a burglary; two statutory mitigators were found including impaired capacity, defendant's age of twenty, and several nonstatutory mitigators including lack of significant criminal history); Booker v. State, 773 So.2d 1079 (Fla.2000) (finding the death penalty proportional where four aggravators were found, including prior convictions of a felony and HAC, and two statutory mitigators were found, namely extreme mental or emotional disturbance and lack of capacity to appreciate the criminality of his conduct, as well as nine nonstatutory mitigators including abuse as a child and inconsistent family life).
This Court has also upheld the death sentence in other double homicide cases with similar aggravating circumstances and mitigating circumstances. See Morton v. State, 789 So.2d 324 (Fla.2001) (holding death sentences proportional where the aggravators included avoiding lawful arrest, HAC, and homicide during commission of a robbery or burglary, weighed against two statutory mitigators of the defendant's age and lack of significant history of prior criminal activity, as well as several nonstatutory mitigators, including unstable home and social life and the defendant's confession and cooperation with the police); Lynch v. State, 841 So.2d 362 (Fla.2003) (finding death penalty proportionate where the aggravators found included murder during the commission of other felonies and HAC, and the mitigators included mental or emotional disturbance and lack of capacity to conform conduct to the requirements of the law).
In sum, we find Schoenwetter's death sentences were not impermissibly imposed. The sentences of death in this case are proportional to sentences imposed in other capital cases with similar factual circumstances and where similar aggravating and mitigating factors were found.

BURDEN OF PERSUASION
Schoenwetter argues that placing a higher burden of persuasion on the defense to prove that life imprisonment should be imposed than is placed on the State to prove capital punishment should be imposed violates fundamental fairness and due process. This claim is similar to claims that have been raised in numerous cases. This Court and the United States Supreme Court have repeatedly found that the standard jury instructions, when taken as a whole, do not shift the burden of proof to the defendant. See Teffeteller v. Dugger, 734 So.2d 1009, 1024 (Fla.1999); San Martin v. State, 705 So.2d 1337, 1350 (Fla. 1997). We are not persuaded by Schoenwetter's arguments that the standard jury *877 instructions given have somehow changed this point of law. We therefore find that the death sentences were not erroneously imposed.

CONSTITUTIONALITY OF SECTION 921.141, FLORIDA STATUTES
Schoenwetter argues that section 921.141, Florida Statutes, allows the trial court to sentence him to death without a unanimous death recommendation, in contravention of the Sixth Amendment to the United States Constitution. The issue of whether section 921.141 is unconstitutional, in whole or in part, has been addressed repeatedly by this Court. We have found the statute comports with the requirements of the Sixth Amendment. See Lugo v. State, 845 So.2d 74, 119 (Fla.2003); Kormondy v. State, 845 So.2d 41 (Fla.2003); Bottoson v. Moore, 833 So.2d 693 (Fla. 2002).

CONCLUSION
For all of the reasons expressed above, we affirm the judgments and sentences, including the two sentences of death, imposed by the trial court in this case.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for its continuing approval of jury instructions that place the burden upon the defendant to prove that the death penalty should not be imposed unless the defendant establishes the existence of sufficient mitigating circumstances to outweigh the aggravating circumstances established by the State. By continuing to approve these standard instructions relieving the State of its constitutionally mandated burden of proof, we are placing the entire Florida death penalty scheme at risk and in violation of the due process guaranteed by the United States and Florida Constitutions. See Francis v. Franklin, 471 U.S. 307, 312, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Mullaney v. Wilbur, 421 U.S. 684, 703-04, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); In re Winship, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).
In fact, from the inception of Florida's current death penalty scheme, we have consistently held that no defendant may be sentenced to death unless the State demonstrates that the aggravation outweighs the mitigation. See, e.g., Alvord v. State, 322 So.2d 533, 540 (Fla.1975) ("No defendant can be sentenced to capital punishment unless the aggravating factors outweigh the mitigating factors."). However, at the same time, we have refused to mandate that juries be instructed on this critical and fundamental principle or to disapprove the standard jury instructions, which place the burden on the defendant to establish sufficient mitigation to outweigh the aggravation. We should wait no longer to correct this longstanding problem.
NOTES
[1] The trial court cited to Taylor v. State, 855 So.2d 1, 31 (Fla.2003), for this proposition.
[2] Cited by the trial court as set forth in section 921.141(5) & (6), Florida Statutes (2000).
[3] See Ford v. State, 802 So.2d 1121 (Fla. 2001).
[4] The nonstatutory mitigators considered, weighed or rejected are: (1) the defendant accepted responsibility by pleading guilty; (2) the defendant was bullied, picked on by his peers, from an early age; (3) the defendant was continually gainfully employed as a teenager and helped his mother financially; (4) the defendant will not pose a danger to the general prison population if given a life sentence without parole; (5) as a result of neurological disorders, specifically Asperger's syndrome and Attention Deficit Hyperactivity Disorder (ADHD), the defendant's ability to socially interact has been impaired; (6) the defendant has had a sexual preoccupation from the age of seven; (7) the defendant had a developmental and emotional age of twelve to thirteen at the time of the offense (the court found that this proposed mitigator was not proven by the greater weight of the evidence); (8) the defendant has a close loving relationship with his mother and his younger sister; (9) while in the tenth grade, the defendant and his mother lived with the mother's boyfriend who physically and emotionally abused the defendant.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] Section 921.141(7), Florida Statutes, specifically provides:

Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
[7] Counsel also moved to have the defendant evaluated for competency. The trial court initially denied the motion because competency had been determined prior to entry of the pleas and he had not observed any conduct that would lead him to believe that Schoenwetter had become incompetent. However, the defendant was examined by three mental health professionals, and the trial court found him competent.
[8] The motion to disqualify was not sworn to by the defendant as required under Florida Rule of Judicial Administration 2.160(c)(3).
[9] In an amicus brief, More Advanced Persons with Autism and Asperger's Syndrome (MAAP) also argued the trial court should have given greater weight to Schoenwetter's diagnosis of Asperger's Syndrome.
[10] Gainful employment and loving relationship with his mother and sister were given no weight.