# Supreme Court of Florida

_____

No. SC15-404
_____

**HARREL FRANKLIN BRADDY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-481
_____

**HARREL FRANKLIN BRADDY,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[June 15, 2017]

PER CURIAM.

Harrel Franklin Braddy, an inmate under sentence of death, appeals an order

of the circuit court denying his motion for postconviction relief filed under Florida

Rule of Criminal Procedure 3.851.  Braddy also petitions this Court for a writ of

habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's denial of relief for a new guilt phase but grant Braddy a new penalty phase based on the United States Supreme Court's opinion in Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and this Court's opinion on remand in Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017).

## I. BACKGROUND

In 2007, Braddy was convicted of first-degree murder, attempted first-degree murder, two counts of kidnapping, burglary of a structure with an assault or battery therein, child neglect causing great bodily harm, and attempted escape. Braddy v. State, 111 So. 3d 810, 826 (Fla. 2012). On appeal, this Court set out the facts of the crimes:

> The evidence presented at Braddy's trial revealed the following facts. Shandelle Maycock, mother to then five-year-old Quatisha, testified that she first met Braddy and his wife Cyteria through a mutual friend from church. Shortly after their initial meeting, Braddy began showing up at Shandelle's home alone, unannounced, and uninvited, staying for short periods of time with no apparent purpose. Shandelle testified that she initially thought of Braddy as a "nice person" and would occasionally ask him for small favors. Braddy once inappropriately placed his hand between Shandelle's legs, but when Shandelle became angry and threatened Braddy with a knife, Braddy left her apartment and later apologized for his actions. Shandelle testified that Braddy never again made a sexual advance toward her.
> On Friday, November 6, 1998, Braddy picked Shandelle up from work and drove her home. After Braddy left Shandelle's apartment at approximately 5:30 p.m., Shandelle began to call around

looking for a ride to pick up Quatisha, who was being watched by a family member. Shandelle had not found a ride by approximately 10 p.m., at which time Braddy returned to her apartment in a gold Lincoln Town Car that he had rented earlier in the day. Braddy told Shandelle that they needed to talk but agreed to first drive Shandelle to pick up Quatisha. After picking up Quatisha and returning to Shandelle's apartment, Braddy again stated that he needed to talk to Shandelle. Shandelle agreed, but before Braddy could talk to Shandelle, the phone rang. Shandelle answered the phone, had a brief conversation, and, after hanging up, told Braddy that he needed to leave because she was expecting company. Shandelle testified that this statement had been a lie—she had not been expecting company but simply wanted Braddy to leave because it was late and she was tired. Upon being told to leave, Braddy immediately attacked Shandelle, threatening to kill her and choking her until she lost consciousness. Shandelle testified that when she regained consciousness, she was still in her apartment but Braddy again choked her until she passed out.

Shandelle's landlord, who occupied the house to which Shandelle's apartment was attached, testified that he heard shouting coming from Shandelle's apartment shortly before midnight. When he looked outside a short time later, the landlord saw Braddy standing at the driver-side door of the Town Car and Quatisha standing by the passenger-side door. He did not see Shandelle.

Shandelle testified that when she awoke for the second time, she was in the back seat of a large car parked in her driveway. Quatisha was in the front passenger seat, and Braddy was in the driver's seat. As Braddy began to drive, Shandelle told Quatisha that they were going to jump out of the car. Braddy warned Shandelle not to jump, but Shandelle nevertheless pulled Quatisha into the backseat and opened the door. When Braddy saw that they were about to jump, he accelerated and turned a corner, causing Shandelle and Quatisha to fall out of the car.

Braddy stopped the car, helped Quatisha back into the car, and put Shandelle in the trunk. Shandelle testified that she remained in the trunk for thirty to forty-five minutes while Braddy continued to drive, after which time the car stopped and Braddy opened the trunk. Braddy pulled Shandelle out of the trunk, threw her to the ground, and again choked her until she lost consciousness, all the while threatening to kill her and accusing her of using him. When Shandelle

- 3 -

woke up, it was daylight and she was lying in a remote area surrounded by foliage. Shandelle walked to the road and flagged down passing motorists, who called the police.

Between 1:30 and 2:30 a.m. on Saturday, November 7, Braddy returned home in the Town Car. Cyteria testified that she was awakened when Braddy came home and, when she went to the door to meet him, saw Braddy wiping down the interior of the Town Car with a cloth. Cyteria also testified that the washing machine was running and that when she looked inside the machine, she saw the clothes Braddy had been wearing earlier that night.

On November 7, police spoke to Shandelle at Glades Hospital, where she had been taken for treatment after being found on the side of the road that morning. Shandelle gave police her statement, along with the names and descriptions of Braddy and Quatisha. Detectives Giancarlo Milito and Juan Murias went to Braddy's home to determine Quatisha's whereabouts. Shortly after the detectives arrived at Braddy's house, they observed him exit the house and drive away in the Town Car. The detectives followed Braddy to a gas station and approached him as he was pumping gas. When the detectives first asked Braddy about Quatisha, Braddy appeared calm and denied any knowledge of the situation. However, when the detectives informed Braddy that Shandelle was alive and had implicated him in Quatisha's disappearance, Braddy turned pale, began to sweat, shake, and cry, and claimed to feel faint. Detective Milito testified that at this point, although Braddy was not under arrest, he placed Braddy in handcuffs for everyone's safety because of "the history that I had of him."

The detectives took Braddy to the Miami-Dade County Police Department and sent the Town Car to be processed. Detectives Otis Chambers and Fernando Suco began to question Braddy at approximately 9 p.m. on Saturday, November 7. When the detectives asked Braddy if he would consent to giving DNA samples, Braddy stated that he knew his rights and wished to be read his rights. Detective Suco, the lead investigator in the case, explained Braddy's rights to him pursuant to Miranda v. Arizona, 384 U.S. 436, 461 (1966), through the use of a standard Miranda form, which Braddy signed and initialed appropriately. After Braddy indicated that he understood and waived his rights, Detective Suco obtained Braddy's consent to take specimens for DNA samples and to search Braddy's home and the Town Car. However, because Braddy hesitated before

signing the last consent form, Suco also obtained search warrants for Braddy's house and the Town Car.

Pursuant to both Braddy's consent to search and the search warrant, police searched the Town Car on Sunday, November 8. After being only partially processed, however, the Town Car was mistakenly released back to the rental agency, where it remained for approximately a day. Police were able to recover the Town Car before it had been cleaned by the rental agency, and pursuant to a second search warrant signed on November 10, investigators removed the trunk liner for DNA testing. Shandelle's blood was found on the liner.

Meanwhile, Braddy's interview continued early into the morning of November 8. Although Braddy spoke to the detectives—becoming visibly agitated when talking about Shandelle—he divulged no information about Quatisha's whereabouts. Feeling that they were not making any progress, the detectives took a break from the interview just before midnight on November 7. During the break, Detective Suco prepared Braddy's arrest form and conferred with other detectives who were gathering information on the case. Having determined that Braddy was lying to them, based on information received from other detectives, the detectives reinitiated the interview at approximately 1:15 a.m. on November 8 and confronted Braddy about lying. Braddy responded by saying, "I can't tell you. Even if I'm found innocent, my family will not talk to me again." The detectives continued to question Braddy, but although there was some interaction, Braddy refused to answer questions about Quatisha and mostly "just sat there or . . . would put his head down."

At approximately 3 a.m. on November 8, Braddy asked to talk to Detective Chambers alone. The detectives complied, but after fifteen to twenty minutes of useless conversation, Detective Chambers brought Detective Suco back into the room. Shortly thereafter, both detectives escorted Braddy to the bathroom, which he had asked to use. While walking through the homicide office to and from the bathroom, Braddy appeared to be "looking around" and "seeing where he was at." After returning from the bathroom, the detectives again left Braddy in the interview room while the detectives compared information with other investigators. The detectives resumed the interview at approximately 3:55 a.m. and again confronted Braddy with evidence that contradicted what Braddy had been telling them. For the next two hours, Braddy responded to questions but refused to

talk about Quatisha's whereabouts.  At around 6:15 a.m. on November 8, in an attempt to evoke an emotional response and elicit information, the detectives lied and told Braddy that his mother had suffered a heart attack.  Although Braddy became visibly upset at this information, he did not divulge any information about Quatisha.

Finally, at around 8 a.m. on November 8, Braddy told the detectives that he had left Quatisha in the same area where he had left Shandelle.  Braddy then stated that he was tired of talking to the detectives and said that if they did not believe his story, they could take him to jail.  At this point, the detectives stopped the interview, relayed Braddy's confession to their supervisor, and went to breakfast.  The detectives returned to the interview room at approximately 11:30 a.m. with breakfast for Braddy.  When Detective Suco walked into the interview room, Braddy was standing on a chair in the corner of the room with his shoes off.  Braddy immediately jumped to the ground and, before Detective Suco could speak, said "I'll take you to where I left her."

The detectives drove Braddy north from Miami-Dade County on U.S. Highway 27, through Broward County and into Palm Beach County, to the site where Shandelle had been found, a scene which was already teeming with authorities.  At Braddy's direction, the detectives drove along the dirt roads and through the fields off the highway for approximately three hours, with other detectives following, but found no trace of Quatisha.  At approximately 2:30 p.m., after detectives had been led on a vain search by Braddy for several hours, Detective Greg Smith physically pulled Braddy out of the car and pinned Braddy against the side of the car by placing his forearm across Braddy's throat.  Detective Smith held Braddy in this position for approximately fifteen seconds, demanding to know where Braddy had left Quatisha.  Braddy gave no response—either verbal or physical—to Detective Smith's use of force and emotional plea.  Having received no information despite his use of force, Detective Smith, along with Braddy and several other detectives, resumed the search for Quatisha on foot.  During the foot search, Detective Smith engaged Braddy in a general conversation regarding his family and hobbies.  At one point, Braddy asked Detective Smith how long it would take a body in the water to surface, speculating that although he had left Quatisha alive, she might have fallen into the water after he left her.

At approximately 4 p.m. on November 8, Braddy admitted to Detective Pat Diaz that Quatisha was in fact at a different location. Braddy then directed several detectives to a section of Interstate 75 in Broward County known as Alligator Alley. Once at Alligator Alley, Braddy told detectives that he had left Quatisha alive on the side of the road at a bridge crossing over a canal. Braddy directed detectives to three such bridges—at highway mile markers 28, 30, and 33—but could not be sure at which bridge he had left Quatisha. Braddy gave different reasons for having left Quatisha on the side of the road in the Everglades in the middle of the night, including that he did so because he was angry with Shandelle and because he was worried that Quatisha would tell people what he had done to Shandelle. Braddy also admitted that when he left Quatisha, he "knew she would probably die" and that when she had not been found by Sunday evening, she was probably dead.

After searching until dark on November 8 and finding no trace of Quatisha, detectives escorted Braddy back to the Miami-Dade County Police Department. Detectives took Braddy back to the interview room where he had originally been kept—a room that had not been touched since Braddy occupied it earlier in the day. Upon entering the room, detectives noticed that a metal ceiling grate in the corner of the room—directly above the chair on which Braddy had been standing earlier in the day—had been forcibly bent up on both ends. Braddy was taken to a different interview room and again questioned by detectives, but Braddy never admitted to killing Quatisha. On the morning of Monday, November 9, two fishermen found the body of a child floating in a canal running parallel to Alligator Alley, around highway mile marker 34. The body was recovered, taken to the Broward County Medical Examiner's office, and identified as that of Quatisha Maycock.

Dr. Joshua Perper, the Chief Medical Examiner for Broward County, was called to the scene where Quatisha's body was found. He examined the body initially when it was brought out of the canal and later performed an autopsy. Dr. Perper testified that Quatisha's left arm, which was missing when her body was discovered, had been bitten off by an alligator after Quatisha had died. Dr. Perper also testified that Quatisha had suffered "brush burn" injuries while she was alive, consistent with her having grazed against a hard, flat surface, such as falling out of a car and sliding on the road. Additionally, Dr. Perper testified that Quatisha had suffered alligator

bites to her torso and head while she was still alive, although he concluded that she was probably not conscious at the time she was bitten. Quatisha had also suffered several injuries after she had died or while she was very close to death, including more "brush burns" and alligator bites, as well as injuries to her lips consistent with fish feeding on her corpse. Dr. Perper concluded that Quatisha's death was primarily caused by blunt force trauma to the left side of her head, consistent with her either having fallen from a great distance or having been thrown onto a prominent, protruding object, such as the jutting rocks along the canal where her body was discovered.

Id. at 822-26 (alteration in original).

At the penalty phase, the State presented victim impact evidence from three relatives or close friends of the victim, including the victim's mother, Shandelle. The State also presented evidence of Braddy's prior criminal history, including the following 1984 crimes: (1) the judgment and sentence from Braddy's attempted first-degree murder, robbery, and kidnapping of Corrections Officer Jose Bermudez, as well as of Braddy's ensuing escape; (2) the arrest affidavit and plea colloquy from Braddy's convictions for armed burglary, robbery, and kidnapping related to his crimes against Joseph and Lorrain Cole; and (3) the judgment and sentence from Braddy's burglary, robbery, and kidnapping of Griffin Davis. The defense presented expert testimony regarding Braddy's ability to adjust to prison life. The defense also presented testimony from Braddy's family and a close friend to establish that Braddy was a good husband and father and that his death would be hard on the family. Id. at 826-27.

The jury recommended the death penalty by a vote of eleven to one, and after a Spencer v. State, 615 So. 2d 688 (Fla. 1993), hearing, the trial court sentenced Braddy to death. The trial court found and gave great weight to five aggravating factors: (1) the victim of the capital felony was a person less than twelve years of age; (2) the capital felony was committed while Braddy was engaged in the commission of a felony crime, namely: kidnapping; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and (5) Braddy was previously convicted of another capital felony or of a felony involving the use or threat of violence to another person. The trial court also considered but gave no weight to the fact that the capital felony was especially heinous, atrocious, or cruel (HAC). Braddy waived all mitigating factors, with the exception of nonstatutory mitigation. Braddy listed a total of sixty-seven nonstatutory mitigating factors in his sentencing memorandum, which the trial court then grouped into nine categories by topic. The trial court gave little or moderate weight to eight of the categories: (1) Braddy had adjusted well to prolonged confinement in his previous incarcerations and might possibly be rehabilitated—little weight; (2) the sentence of life imprisonment was available to the court—little weight; (3) Braddy

- 9 -

conducted himself in an appropriate manner at trial—moderate weight; (4) the friends in Braddy's life considered him to be of value—little weight; (5) Braddy's wife and children supported him unconditionally—moderate weight; (6) Braddy's execution would presumably have an extreme impact on his family and friends—little weight; (7) Braddy's parents and siblings considered him to be an important member of the family and believed that his life could be of value to other members of the family—little weight; and (8) Braddy attended church and professed dedication to Christian principles and beliefs—little weight. With respect to the remaining category, the trial court considered but gave no weight to the fact that Braddy did not sexually molest Quatisha. Braddy, 111 So. 3d at 827-28.

Braddy raised thirteen claims on direct appeal: (A) the trial court erred in denying Braddy's motion to suppress evidence obtained in violation of his right to remain silent and his right to an attorney; (B) the trial court erred in failing to timely rule on and ultimately denying Braddy's motions to disqualify the trial judge; (C) the State failed to establish the venue alleged in the indictment for the charges of murder and attempted murder; (D) the trial court erred in admitting into evidence the second search warrant for the Town Car and the accompanying affidavit; (E) the trial court erred in denying Braddy's motion for mistrial based on Detective Milito's prejudicial testimony regarding Braddy's prior criminal history; (F) the trial court erred in allowing the State to engage in improper argument

during its guilt phase closing argument; (G) the evidence is legally insufficient to support Braddy's convictions for burglary, child neglect, and attempted escape; (H) the trial court erred in allowing the State to engage in improper argument during its penalty phase closing argument; (I) the trial court erred in requiring Braddy to argue all nonstatutory mitigation as a single mitigating factor; (J) the trial court erred in allowing the State to present victim impact evidence that Shandelle had contracted Crohn's disease as a result of the murder; (K) the trial court erred in allowing the State to introduce impermissible hearsay evidence to prove Braddy's prior felony convictions; (L) the trial court erred in sentencing Braddy to death because Florida's capital sentencing proceedings are unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); and (M) the cumulative effect of the above errors deprived Braddy of due process and a reliable sentencing proceeding. Braddy, 111 So. 3d at 828-29. This Court determined that sufficient evidence supported the convictions and denied all of Braddy's claims. Id. at 829-62.

Capital Collateral Regional Counsel-South (CCRC) was appointed to represent Braddy in postconviction proceedings. On October 2, 2014, Braddy timely filed a motion for postconviction relief. Braddy's motion asserted: (1) the postconviction court's denial of CCRC's motion to withdraw violates Braddy's rights to conflict-free counsel, due process, and equal protection; (2) the

- 11 -

postconviction court's refusal to allow Braddy to represent himself in collateral proceedings violates Braddy's right of self-representation; (3) requiring Braddy to file his postconviction motion one year after his conviction became final violates Braddy's rights to due process and equal protection; (4) section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852 are unconstitutional both facially and as applied to Braddy in violation of article I, section 24 of the Florida Constitution; (5) Braddy was deprived of his right to a fair and impartial jury; (6) Braddy was deprived of his right to a reliable adversarial testing at the guilt phase due to ineffective assistance of counsel, the State's failure to disclose exculpatory evidence, and prosecutorial and judicial misconduct; (7) Braddy was denied adversarial testing at the penalty phase due to ineffective assistance of counsel and/or State misconduct; and (8) Florida's method of execution by lethal injection is unconstitutional.

On February 19, 2015, the postconviction court entered an order denying Braddy's claims. State v. Braddy, No. F98-37767 (Fla. 11th Jud. Cir. Feb. 19, 2015) (Postconviction Order). On appeal, Braddy argues that: (1) the postconviction court's denial of CCRC's motion to withdraw and/or failure to hold

Nelson[1] hearings on two of Braddy's pro se motions to discharge CCRC[2] violated Braddy's rights to conflict-free counsel, due process, and equal protection; (2) section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852 are unconstitutional as applied to Braddy in violation of article I, section 24 of the Florida Constitution; (3) Braddy was denied adversarial testing at the penalty phase due to ineffective assistance of counsel and/or State misconduct; (4) trial counsel was ineffective for failing to preserve a challenge to comments made by the prosecution during its guilt phase closing argument and penalty phase closing argument; (5) Braddy was deprived of his right to a fair and impartial jury; and (6) Braddy was deprived of his right to a reliable adversarial testing at the guilt phase due to ineffective assistance of counsel, the State's failure to disclose exculpatory evidence, and prosecutorial and judicial misconduct.[3]  In addition, Braddy filed a

---

1.  Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973).

2.  On December 31, 2014, Braddy filed a pro se motion to discharge in this Court.  On March 10, 2015, this Court temporarily relinquished jurisdiction for the postconviction court to consider Braddy's pro se motion to discharge, and the postconviction court denied it on March 13, 2015.  On March 18, 2015, Braddy amended his notice of appeal to include the order denying his pro se motion to discharge.  On October 21, 2015, Braddy filed another pro se motion to discharge in this Court, which this Court struck as unauthorized.

3.  We decline to address, in this postconviction appeal, the order of the postconviction court summarily dismissing Braddy's successive postconviction motion on July 24, 2015.

- 13 -

petition for a writ of habeas corpus, asserting that: (1) Braddy is entitled to relief under Hurst v. Florida; (2) this Court failed to conduct a proper harmless error analysis of errors recognized on direct appeal; and (3) Braddy was deprived of his right to a fair and impartial jury. Because we determine that Braddy is entitled to a new penalty phase under Hurst v. Florida and Hurst, we address only Braddy's guilt phase claims and none of the other penalty phase claims.

## II. MOTION FOR POSTCONVICTION RELIEF

### A. CCRC's Motion to Withdraw and Braddy's Pro Se Motions to Discharge

Braddy claims that the postconviction court's denial of CCRC's motion to withdraw and/or failure to hold Nelson hearings on two of Braddy's pro se motions to discharge CCRC violated his rights to conflict-free counsel, due process, and equal protection. "A court's decision involving withdrawal or discharge of counsel is subject to review for abuse of discretion." Weaver v. State, 894 So. 2d 178, 187 (Fla. 2004). As explained below, the postconviction court did not err regarding the motion to withdraw or the motions to discharge.

Section 27.703(1), Florida Statutes (2013), "places the responsibility of determining whether an actual conflict exists on the [sentencing] court." Abdool v. Bondi, 141 So. 3d 529, 553 (Fla. 2014) (emphasis added). The statute provides:

> If, at any time during the representation of a person, the capital
> collateral regional counsel alleges that the continued representation of
> that person creates an actual conflict of interest, the sentencing court

- 14 -

shall, upon determining that an actual conflict exists, designate another regional counsel. . . . An actual conflict of interest exists when an attorney actively represents conflicting interests. A possible, speculative, or merely hypothetical conflict is insufficient to support an allegation that an actual conflict of interest exists.

§ 27.703(1), Fla. Stat.

"An actual conflict of interest that adversely affects counsel's performance violates the Sixth Amendment of the United States Constitution." McWatters v. State, 36 So. 3d 613, 635 (Fla. 2010). "To prove a claim that an actual conflict of interest existed between a defendant and his counsel, the defendant must show that his counsel actively represented conflicting interests and that the conflict adversely affected counsel's performance." Thompson v. State, 759 So. 2d 650, 661 (Fla. 2000) (quoting Quince v. State, 732 So. 2d 1059, 1063 (Fla. 1999)); see Cuyler v. Sullivan, 446 U.S. 335, 348, 350 (1980). "A possible, speculative or merely hypothetical conflict is 'insufficient to impugn a criminal conviction.' " Hunter v. State, 817 So. 2d 786, 792 (Fla. 2002) (quoting Cuyler, 446 U.S. at 350). Even "[i]f a defendant successfully demonstrates the existence of an actual conflict, the defendant must also show that this conflict had an adverse effect upon his lawyer's representation." Id. "[P]rejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable . . . ." Mickens v. Taylor, 535 U.S. 162, 173 (2002); see State v. Larzelere, 979 So. 2d 195, 208 (Fla. 2008) ("Prejudice is presumed where an actual

conflict is shown to have adversely affected a client's representation."); State v.

Coney, 845 So. 2d 120, 133 (Fla. 2003) ("Once a defendant satisfies both prongs

of the Cuyler test, prejudice is presumed and the defendant is entitled to relief.").

On March 7, 2014, CCRC filed a motion to withdraw, claiming a conflict of

interest:

> Capital Collateral Regional Counsel-South, Neal A. Dupree, acting in his capacity as a supervising State Attorney in and for Broward County, was a direct supervisor of the prosecutors who signed off on Braddy's guilty plea in Broward County [in 1984]. In that case, Mr. Braddy pled guilty to charges of burglary, kidnapping, and escape [related to his crimes against Joseph and Lorrain Cole]. That prior [conviction] was used as an aggravator in the instant case ultimately resulting in a judgment of death. Mr. Braddy has been made aware of these circumstances and has informed undersigned counsel that it is his wish for CCRC-South to withdraw from further representation due to an irreconcilable conflict.

On March 21, 2014, the postconviction court held a hearing on the motion to

withdraw. Neil A. Dupree, the appointed CCRC for the South District Region,

explained at the hearing that he was a felony trial supervisor in Broward County

from 1983 to 1987. During that time, Dupree oversaw five felony divisions and

supervised ten to fifteen attorneys. In his role as a supervisor, Dupree supervised

the assistant state attorneys that prosecuted Braddy for his crimes against the

Coles[4] and signed off on the plea agreement in that case. Dupree's involvement in

---

4. On direct appeal, this Court explained that the trial court found the existence of the prior violent felony aggravator—one of five aggravators—based

- 16 -

the prior case was limited to discussing and approving the plea agreement. Dupree stated at the hearing: "I was directly involved in the prosecution of the case" and "I do believe that is an actual conflict." However, Dupree never suggested that his involvement in the prior case would impair his ability to represent Braddy in this case. Dupree also explained at the hearing that he did not even remember Braddy's prior case when it was initially brought to his attention: "Frankly, I didn't realize who Mr. Braddy was, to be honest with you, but when I saw [Braddy's letter referencing the prior case] I went down to the State Attorney[']s Office and had the files pulled out for me and I reviewed the files and everything and I did sign off on the plea agreement."

Braddy claims that the postconviction court abused its discretion in denying CCRC's motion to withdraw because Dupree had an actual conflict of interest based on his role as a supervising attorney in the prior case. However, even if an actual conflict did exist, Braddy has failed to demonstrate that the conflict adversely affected Dupree's representation in postconviction proceedings in this case. See Hunter, 817 So. 2d at 792 (noting that the defendant must satisfy both prongs of Cuyler to be entitled to relief). Braddy claims that "the adverse effect is that collateral counsel has not been able to establish a relationship of trust with

---

on Braddy's 1984 crimes against the Coles, Davis, and Bermudez. Braddy, 111 So. 3d at 860.

Braddy as a direct result of the conflict." However, the Supreme Court has "reject[ed] the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel." Morris v. Slappy, 461 U.S. 1, 14 (1983); see Wheat v. United States, 486 U.S. 153, 159 (1988) (explaining that "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such' " (quoting United States v. Cronic, 466 U.S. 648, 657 n.21 (1984))). As this Court has explained, "General loss of confidence or trust standing alone will not support withdrawal of counsel." Schoenwetter v. State, 931 So. 2d 857, 870 (Fla. 2006). Moreover, this record does not demonstrate that "the attorney-client relationship had deteriorated to the point where counsel could no longer give effective aid in the fair representation of the defense." Id. Braddy asserts that "[i]n the Sixth Amendment context, prejudice to a defendant is presumed based on the affirmative representation by counsel of a conflict." However, that is simply not the case. See, e.g., Mickens, 535 U.S. at 173; Larzelere, 979 So. 2d at 208; Coney, 845 So. 2d at 133. Although Braddy claims that he "is, at the very least, entitled to an evidentiary hearing on his claim that an actual conflict is present," Braddy did not request the opportunity to present any evidence at the hearing held on the motion to withdraw. Instead, he relied on the allegations in the motion and Dupree's statements as an officer of the court. Braddy thus invited any error regarding the

postconviction court's failure to hold an evidentiary hearing.  See Pope v. State, 441 So. 2d 1073, 1076 (Fla. 1983) ("A party may not invite error and then be heard to complain of that error on appeal.").

Braddy claims that the postconviction court erred in failing to hold Nelson hearings on two of Braddy's pro se motions to discharge filed in this Court on December 31, 2014,[5] and October 21, 2015.  This claim lacks merit.  "This Court has consistently found a Nelson hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made."  Morrison v. State, 818 So. 2d 432, 440 (Fla. 2002).  "Similarly, a trial court does not err in failing to conduct a Nelson inquiry where the defendant merely expresses dissatisfaction with his attorney."  Id.  A review of the first motion to discharge shows that Braddy's complaints primarily concerned the conflict alleged in CCRC's motion to withdraw, his counsel's communication with him, and his disagreements with counsel regarding strategic decisions.  Moreover, the record reflects that the postconviction court had already heard from Braddy regarding his position on the motion to withdraw and his

_____

5. In his appellate briefs, Braddy refers to a pro se motion to discharge purportedly filed by Braddy in this Court on March 3, 2015.  However, the docket in this case contains no such motion.  We therefore conclude that Braddy is actually referring to the pro se motion to discharge filed by Braddy in this Court on December 31, 2014.

- 19 -

dissatisfaction with CCRC during the numerous hearings it held regarding the motion to withdraw and Braddy's desire to represent himself. The record further reflects that this is the same motion to discharge that the postconviction court had already denied on January 7, 2015. Therefore, the postconviction court did not abuse its discretion in denying the first motion to discharge without holding a Nelson inquiry. The postconviction court had no jurisdiction to hold a Nelson inquiry on the second motion to discharge because it was filed in this Court after this Court had assumed jurisdiction over this matter. Therefore, the postconviction court did not err in failing to hold a hearing when it had no jurisdiction.

### B. Section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852

Braddy claims that section 119.19, Florida Statutes, and Florida Rule of Criminal Procedure 3.852 are unconstitutional as applied to Braddy in violation of article I, section 24 of the Florida Constitution because he has been denied access to public records. Within this claim, Braddy argues that the postconviction court erred in denying him access to public records under section 119.19 and rule 3.852, namely: (1) certain materials in sealed box 6202 that were purportedly claimed to be exempt by the Miami-Dade State Attorney under the work product exemption in section 119.071(1)(d)1., Florida Statutes, and (2) the personnel and internal affairs files of the police and "criminalists" who testified against him at trial. This Court reviews constitutional challenges to statutes de novo, Jackson v. State, 191 So. 3d

423, 426 (Fla. 2016), and the denial of public records requests for an abuse of discretion, Pardo v. State, 108 So. 3d 558, 565 (Fla. 2012). As explained below, nothing within this record demonstrates that the postconviction court erred in denying Braddy's claim regarding the public records requests.

Article I, section 24 of the Florida Constitution, and chapter 119, Florida Statutes, guarantee access to public records. See State v. City of Clearwater, 863 So. 2d 149, 151 (Fla. 2003). Rule 3.852 governs the procedure to obtain public records for use in capital postconviction litigation. See Abdool, 141 So. 3d at 550 ("[F]lorida Rule of Criminal Procedure 3.852 . . . governs capital postconviction public records production . . . ."); Sims v. State, 753 So. 2d 66, 69 (Fla. 2000) ("This rule is a discovery rule for public records production ancillary to proceedings pursuant to rules 3.850 and 3.851." (quoting Amends. to Fla. R. of Crim. Pro., 754 So. 2d 640, 643 (Fla. 1999))). This Court has repeatedly rejected constitutional challenges to the requirements of rule 3.852. See, e.g., Howell v. State, 133 So. 3d 511, 515-16 (Fla. 2014); Wyatt v. State, 71 So. 3d 86, 110-11 (Fla. 2011).

Section 119.071(1)(d)1., Florida Statutes (2014), provides the following exemption from public records disclosure:

> A public record that was prepared by an agency attorney (including an attorney employed or retained by the agency or employed or retained by another public officer or agency to protect or represent the interests of the agency having custody of the record) or

- 21 -

prepared at the attorney's express direction, that reflects a mental impression, conclusion, litigation strategy, or legal theory of the attorney or the agency, and that was prepared exclusively for civil or criminal litigation or for adversarial administrative proceedings, or that was prepared in anticipation of imminent civil or criminal litigation or imminent adversarial administrative proceedings, is exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution until the conclusion of the litigation or adversarial administrative proceedings. For purposes of capital collateral litigation as set forth in s. 27.7001, the Attorney General's office is entitled to claim this exemption for those public records prepared for direct appeal as well as for all capital collateral litigation after direct appeal until execution of sentence or imposition of a life sentence.

"[A]ny exemption under this section exists only until the conclusion of the litigation or, in the case of public records prepared for an appeal or postconviction proceedings, only until the execution of the sentence." Lightbourne v. McCollum, 969 So. 2d 326, 332 (Fla. 2007); see State v. Kokal, 562 So. 2d 324, 327 (Fla. 1990) ("[W]e further hold that 'the conclusion of litigation' with respect to a criminal conviction and sentence occurs when that conviction and sentence have become final.").

However, not all materials are "public records" within the meaning of chapter 119, Florida Statutes:

To give content to the public records law which is consistent with the most common understanding of the term "record," we hold that a public record, for purposes of section 119.011(1), is any material prepared in connection with official agency business which is intended to perpetuate, communicate, or formalize knowledge of some type. To be contrasted with "public records" are materials prepared as drafts or notes, which constitute mere precursors of governmental "records" and are not, in themselves, intended as final evidence of the

- 22 -

knowledge to be recorded.  Matters which obviously would not be public records are rough drafts, notes to be used in preparing some other documentary material, and tapes or notes taken by a secretary as dictation.  Inter-office memoranda and intra-office memoranda communicating information from one public employee to another or merely prepared for filing, even though not a part of an agency's later, formal public product, would nonetheless constitute public records inasmuch as they supply the final evidence of knowledge obtained in connection with the transaction of official business.

It is impossible to lay down a definition of general application that identifies all items subject to disclosure under the act.  Consequently, the classification of items which fall midway on the spectrum of clearly public records on the one end and clearly not public records on the other will have to be determined on a case-by-case basis.

Shevin v. Byron, Harless, Schaffer, Reid & Assoc., Inc., 379 So. 2d 633, 640 (Fla. 1980) (emphasis added).  This Court has explained that "pretrial materials which include notes from the attorneys to themselves designed for their own personal use in remembering certain things or preliminary guides intended to aid the attorneys when they later formalize their knowledge are not within the term 'public record.'"  Lopez v. State, 696 So. 2d 725, 728 (Fla. 1997) (citing Kokal, 562 So. 2d at 327).  Likewise, "notes of the State Attorney's investigations" and "annotated photocopies of decisional law" do not constitute public records.  Atkins v. State, 663 So. 2d 624, 626 (Fla. 1995); see Scott v. Butterworth, 734 So. 2d 391, 393 (Fla. 1999) (holding that "handwritten notes and drafts of pleadings" are not subject to public records disclosure).

Braddy claims that the postconviction court erred as a matter of law in denying him access to certain materials in sealed box 6202—fourteen manila envelopes pertaining to attorney work product and notes—that were purportedly claimed to be exempt by the State Attorney under the work product exemption in section 119.071(1)(d)1., Florida Statutes. Braddy correctly argues that the work product exemption in section 119.071(1)(d)1. is inapplicable to the materials because Braddy's conviction and sentence have become final. The postconviction court concluded that the materials "were either work product not subject to disclosure or documents which had already been provided to [Braddy]." It thus is apparent that the postconviction court misunderstood the scope of the exemption for work product. The record in this case further indicates that the State Attorney did not claim that the statutory work product exemption applied to the materials. The State Attorney specifically asserted in a transmittal notice to the public repository that the materials were not public records under Shevin, Kokal, and Atkins.

We conclude that the postconviction court did not abuse its discretion in denying Braddy access to the vast majority of the materials in sealed box 6202 pertaining to attorney work product and notes. The materials primarily consist of handwritten attorney notes, draft documents, and annotated copies of decisional law, which do not constitute public records. It is not clear from this record whether

- 24 -

Braddy has been denied access to a small number of the materials—inter-office memoranda, intra-office memoranda, and e-mails—which constitute public records. Regardless, none of the materials in sealed box 6202 pertaining to attorney work product and notes contain any material that is exculpatory or otherwise pertaining to a postconviction claim.

Florida Rule of Criminal Procedure 3.852(i)(2) requires production of additional public records upon a finding of the following:

(A) collateral counsel has made a timely and diligent search of the records repository;
(B) collateral counsel's affidavit identifies with specificity those additional public records that are not at the records repository;
(C) the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence; and
(D) the additional records request is not overly broad or unduly burdensome.

This Court has "consistently held that a defendant bears the burden of demonstrating that the records sought relate to a colorable claim." Twilegar v. State, 175 So. 3d 242, 250 (Fla. 2015). "As this Court has emphasized, rule 3.852 'is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief.' " Valle v. State, 70 So. 3d 530, 549 (Fla. 2011) (quoting Moore v. State, 820 So. 2d 199, 204 (Fla. 2002)). "Accordingly, where a defendant cannot demonstrate that he or she is entitled to relief on a claim or that records are relevant or may reasonably lead to the

discovery of admissible evidence, the trial court may properly deny a public records request." Twilegar, 175 So. 3d at 250 (quoting Mann v. State, 112 So. 3d 1158, 1163 (Fla. 2013)).

Braddy claims that the postconviction court abused its discretion in denying him access to the personnel and internal affairs files of the police and "criminalists" who testified against him at trial. However, the postconviction court did not abuse its discretion in denying Braddy's request for such additional records. At a hearing held on September 2, 2014, the postconviction court denied all of Braddy's requests for additional public records from the Miami-Dade Police Department, except for the internal affairs file of Detective Smith, the officer who inappropriately used force against Braddy during the search for Quatisha. See Braddy, 111 So. 3d at 832. The postconviction court found that Braddy failed to demonstrate that the personnel and internal affairs files of the other police and criminalists who testified against him at trial were "relevant" to a colorable claim. A review of the transcript from the hearing held on Braddy's requests supports the postconviction court's conclusion. For example, Braddy's counsel conceded at the hearing that not all of the personnel and internal affairs files sought by Braddy were relevant:

> I mean, I think it's a fair question.
>     Why do we want this? Well, I don't know, but it's our job to look at every single piece of paper that might be relevant in this case. We can't know what's out there until we see what's out there. . . .

So it's true, I don't know what the impeachment might be, but I know why I want the [commendations, training certificates, and school diplomas]. . . .

Well, I think -- I believe that the 1990 [use of force complaint] would be outside of the [relevant] time frame that the court has limited us to, your Honor.

Although Braddy argued "that the personnel and internal affairs files might contain impeachment material," Braddy failed to identify at the hearing any incident that would even potentially be admissible as impeachment. Given that the postconviction court ordered the production of Detective Smith's internal affairs file, Braddy's speculative request for the other files "was nothing more than a fishing expedition." Dennis v. State, 109 So. 3d 680, 699 (Fla. 2012).

Braddy claims that section 119.19 and rule 3.852 were unconstitutionally applied to his case because he has been denied access to public records. We reject this claim because Braddy has not clearly been denied access to records to which he is entitled under section 119.19 or rule 3.852.

### C. Ineffective Assistance of Guilt Phase Counsel Claims

### 1. Prosecutor's Comments

Braddy claims that trial counsel was ineffective for failing to preserve a challenge to comments made by the prosecution during its guilt phase closing argument. As explained below, the postconviction court did not err in denying Braddy's ineffective assistance of guilt phase counsel claim.

In order to obtain relief on a claim of ineffective assistance of counsel, "a defendant must establish deficient performance and prejudice." Gore v. State, 846 So. 2d 461, 467 (Fla. 2003). Under the first prong, "the defendant must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). Under the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687. "This Court has held that counsel's failure to object to improper comments cannot prejudice the outcome if the comments were raised on direct appeal and do not rise to the level of fundamental error." Rogers v. State, 957 So. 2d 538, 550 (Fla. 2007); see Lowe v. State, 2 So. 3d 21, 37-38 (Fla. 2008); Chandler v. State, 848 So. 2d 1031, 1045-46 (Fla. 2003).

Braddy argues that trial counsel's failure to object to comments made by the prosecution during its guilt phase closing argument was deficient performance. Braddy further argues that he was prejudiced because the result of his direct appeal

would have been different had his trial counsel objected during the guilt phase to such comments. However, Braddy's ineffectiveness claim lacks merit because he is unable to show prejudice. On direct appeal, Braddy challenged several comments made during the State's guilt phase closing argument that were not preserved for appeal. This Court considered the issue of whether those allegedly improper comments constituted fundamental error and found that they did not, either individually or cumulatively:

> Braddy challenges a number of comments made during the State's closing argument. Several of the comments, however, were not preserved for appeal because Braddy either failed to object on the specific legal grounds that he now asserts or because, after having made objections that the trial court sustained, Braddy failed to move for a mistrial. <u>None of the unpreserved comments rises to the level of fundamental error, nor does the cumulative effect of those unpreserved comments in which we identify possible error constitute fundamental error</u>. Moreover, the comments that Braddy did preserve for appeal were properly ruled on by the trial court. Accordingly, having considered the State's guilt phase closing argument as a whole, paying specific attention to the objected-to and unobjected-to comments, we deny Braddy's claim.

Braddy, 111 So. 3d at 837-38 (emphasis added). Because this Court found no fundamental error as to any of the unpreserved comments on direct appeal, Braddy fails to demonstrate that counsel's failure to preserve a challenge to the comments resulted in prejudice sufficient to undermine the outcome of the trial under Strickland.

### 2. Reliable Adversarial Testing

Braddy claims that he was deprived of his right to a reliable adversarial testing at the guilt phase due to ineffective assistance of counsel. Specifically, Braddy claims that trial counsel was ineffective for failing to retain: (1) an expert in police practices or police misconduct to challenge the voluntariness of Braddy's statements to the police; (2) a crime scene or forensic expert to challenge the chain of custody of DNA evidence found in the trunk of the gold Lincoln Town Car driven by Braddy; and (3) a forensic pathologist to challenge the State's theory regarding Quatisha's death. As explained below, the postconviction court did not err in denying this claim.

Braddy's claim that trial counsel was ineffective for failing to retain an expert in police practices or police misconduct to challenge the voluntariness of Braddy's statements to the police is insufficiently pleaded because Braddy fails to explain how the presentation of this testimony would have created a reasonable probability of a different result at trial, that is, a reasonable probability that the result of the proceeding would have been different. See Ey v. State, 982 So. 2d 618, 623 (Fla. 2008) ("To raise a facially sufficient claim of ineffective assistance of counsel, a defendant must allege specific facts meeting both of Strickland's prongs."). Braddy merely alleges that the presentation of this testimony would have resulted in the suppression of his statements prior to trial, or a reasonable probability that the jury would have discounted his statements.

Regardless, Braddy could not demonstrate prejudice because there is no reasonable probability that the suppression of Braddy's statements to the police would have created a different result at trial. "The evidence at trial established that Braddy took both Shandelle and Quatisha from their home after getting into a fight with Shandelle and choking her unconscious." Braddy, 111 So. 3d at 861. "The evidence further established that, after Braddy took Shandelle out of the trunk and choked her unconscious on a desolate road, Shandelle never saw Quatisha alive again." Id. The jury heard Shandelle's eyewitness account of the crimes. Id. at 822-23. Shandelle's landlord confirmed that Braddy had been seen with Quatisha shortly before midnight, next to the Town Car, the night she disappeared. Id. at 823, 861. Within a few hours thereafter, Cyteria saw "Braddy wiping down the interior of the Town Car with a cloth" and "the clothes Braddy had been wearing earlier that night" in the washing machine. Id. at 823. DNA testing confirmed that Shandelle's blood was found on the trunk liner of the Town Car. Id. at 824. The jury heard testimony that "when the detectives informed Braddy that Shandelle was alive and had implicated him in Quatisha's disappearance, Braddy turned pale, began to sweat, shake, and cry, and claimed to feel faint." Id. at 823. Quatisha's body was found by two fishermen, independent of the police and Braddy. Id. at 825-26. Quatisha suffered brush burns while she was alive consistent with her "having grazed against a hard, flat surface, such as falling out of a car and sliding

- 31 -

on the road." Id. at 826. Dr. Perper, the Chief Medical Examiner for Broward County, "concluded that Quatisha's death was primarily caused by blunt force trauma to the left side of her head, consistent with her either having fallen from a great distance or having been thrown onto a prominent, protruding object, such as the jutting rocks along the canal where her body was discovered." Id. "[T]he evidence established that the primary cause of Quatisha's death was severe trauma to her head, consistent with either being thrown or having fallen with some force onto the rocks that lined the canal where Quatisha was found." Id. at 861. Given the overwhelming evidence of Braddy's guilt, he cannot demonstrate prejudice such that our confidence in the outcome is undermined.

Likewise, Braddy's claim that trial counsel was ineffective for failing to retain a crime scene or forensic expert to challenge the credibility and reliability of the DNA evidence collected from the Town Car is insufficiently pleaded because Braddy fails to explain how the presentation of this testimony would have created a reasonable probability of a different result at trial. Braddy merely alleges that the presentation of this testimony would have challenged the credibility and reliability of the DNA evidence at trial.

Regardless, Braddy could not demonstrate prejudice because there is no reasonable probability that challenging the credibility and reliability of the DNA evidence collected from the Town Car would have created a different result at trial.

Even if the DNA evidence had not been introduced, the jury still would have heard Braddy's incriminating statements and the testimony of Shandelle, Shandelle's landlord, Cyteria, and Dr. Perper. Furthermore, Quatisha's body was found by two fishermen, independent of the DNA evidence. Given the overwhelming evidence of guilt presented, Braddy cannot demonstrate prejudice such that our confidence in the outcome is undermined.

Similarly, Braddy's claim that trial counsel was ineffective for failing to retain a forensic pathologist to challenge the State's theory regarding Quatisha's death is insufficiently pleaded because Braddy fails to explain how the presentation of this testimony would create a reasonable probability of a different result at trial. Braddy merely alleges that the presentation of this testimony would have challenged Dr. Perper's theory about when Quatisha's injuries were sustained and shown that Quatisha died before she was left in the Everglades.

Once again, Braddy could not demonstrate prejudice because there is no reasonable probability that challenging Dr. Perper's testimony as to the timing of Quatisha's death would have created a different result at trial. The evidence supports the conclusion that Quatisha was alive when Braddy left her to die in the Everglades because Braddy confessed "that he had left Quatisha alone out in the Everglades in the middle of the night" and "he knew when he left her that she would probably die." Id. Moreover, even if Quatisha died before she was left in

the Everglades, Braddy would still be guilty of felony murder based on the kidnapping of Quatisha. See id. at 861-62.

Braddy complains that he was deprived of his right to a reliable adversarial testing due to the State's failure to disclose exculpatory evidence and prosecutorial and judicial misconduct. But Braddy fails to make any argument regarding these claims on appeal. Accordingly, Braddy has waived any issue on appeal regarding these claims. See Duest v. Dugger, 555 So. 2d 849, 852 (Fla. 1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.").

## D. Fair and Impartial Jury

Braddy claims that he was deprived of his right to a fair and impartial jury. Braddy argues that Juror Ravelo committed juror misconduct by failing to disclose that he was the subject of a criminal investigation during voir dire or the guilt phase. This claim is procedurally barred because "it could have and should have been raised on direct appeal." Troy v. State, 57 So. 3d 828, 838 (Fla. 2011) (quoting Elledge v. State, 911 So. 2d 57, 77 n.27 (Fla. 2005)). In any event, Braddy's claim is refuted by the trial record because Juror Ravelo was not permitted to continue to serve on the jury after he came under prosecution. The guilt phase ended on July 17, 2007. Juror Ravelo—one of the jurors who sat on

Braddy's guilt phase jury—was arrested for a third degree felony for littering on August 23, 2007. Thereafter, Juror Ravelo called the trial court and informed the bailiff that he had been arrested since he began serving on the jury. On August 28, 2007, before the penalty phase began, the trial court questioned Juror Ravelo outside the presence of the jury regarding the arrest and discharged him. Although Juror Ravelo was arrested "[a]lmost one month after some pictures were taken by someone," nothing within the trial record indicates that Juror Ravelo was under prosecution prior to his arrest.

This Court has also held with respect to claims of juror nondisclosure that (1) "the complaining party must establish that the information is relevant and material to jury service in the case," (2) "the juror concealed the information during questioning," and (3) "the failure to disclose the information was not attributable to the complaining party's lack of diligence." Lugo v. State, 2 So. 3d 1, 13 (Fla. 2008) (quoting De La Rosa v. Zequeira, 659 So. 2d 239, 241 (Fla. 1995)). Braddy's claim equally lacks merit under this standard. Braddy's claim that Juror Ravelo concealed information during voir dire or the guilt phase that he was under criminal investigation for littering is pure speculation. Moreover, Braddy was not diligent in pursuing this claim at the trial level. When given the opportunity to question Juror Ravelo, Braddy did not ask him whether he was aware of the criminal investigation prior to his arrest.

Braddy suggests that the State withheld <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), material from the defense. However, Braddy has failed to establish a <u>Brady</u> violation. "To establish a <u>Brady</u> violation, the defendant has the burden to show that: (1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." <u>Davis v. State</u>, 136 So. 3d 1169, 1184 (Fla. 2014). Braddy has not shown that information regarding Juror Ravelo's prosecution would exculpate Braddy regarding any crime or impeach any witness.

Braddy complains that Rule Regulating the Florida Bar 4-3.5(d)(4) prohibited Braddy's counsel from interviewing Juror Ravelo. But Braddy fails to make any argument regarding this rule on appeal. Therefore, Braddy has waived any issue on appeal regarding rule 4-3.5(d)(4).

Braddy complains that the postconviction court denied his requests for additional public records concerning jurors. But Braddy fails to argue on appeal that the postconviction court erred in denying his requests. Accordingly, Braddy has waived any issue on appeal regarding these additional public records requests.

### III.  PETITION FOR WRIT OF HABEAS CORPUS

### A.  <u>Hurst v. Florida</u>

Before Braddy petitioned this Court for a writ of habeas corpus, the United States Supreme Court issued its decision in Hurst v. Florida in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. at 619. On remand in Hurst we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

Hurst, 202 So. 3d at 57.

Hurst v. Florida and Hurst apply retroactively to defendants in Braddy's position who were sentenced under Florida's former, unconstitutional capital sentencing scheme after the United States Supreme Court decided Ring in 2002. Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016). And in light of the nonunanimous jury recommendation to impose a death sentence, it cannot be said that the failure to require a unanimous verdict here was harmless. See Franklin v. State, 209 So. 3d 1241, 1248 (Fla. 2016) ("In light of the non-unanimous jury

- 37 -

recommendation to impose a death sentence, we reject the State's contention that any <u>Ring</u>- or <u>Hurst v. Florida</u>-related error is harmless."), <u>petition for cert. filed</u>, No. 16-1170 (U.S. Mar. 23, 2017).  We therefore conclude that Braddy is entitled to a new penalty phase.

## B.  This Court's Prior Review

Braddy claims that this Court failed to conduct a proper harmless error analysis of errors recognized on direct appeal.   Specifically, Braddy claims that this Court erroneously affirmed the trial court's denial of Braddy's motion to suppress and erroneously found that any improper comments made during the State's guilt phase closing argument were harmless error.  This claim is procedurally barred because "habeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.85[1] motion."  <u>Wyatt</u>, 71 So. 3d at 112 n.20 (quoting <u>Hardwick v. Dugger</u>, 648 So. 2d 100, 105 (Fla. 1994)).  "This Court has consistently held that habeas claims wherein the defendant challenges this Court's previous standard of review in the case are procedurally barred."  <u>Bottoson v. State</u>, 813 So. 2d 31, 35 (Fla. 2002).

## C.  Fair and Impartial Jury

Braddy claims that he was deprived of his right to a fair and impartial jury. This claim is procedurally barred because Braddy raised it in his postconviction

- 38 -

motion.  See England v. State, 151 So. 3d 1132, 1141 (Fla. 2014).  Regardless, as

explained previously, the postconviction court did not err in denying Braddy's

claim regarding Juror Ravelo.

## IV.  CONCLUSION

Based on the foregoing, we affirm the postconviction court's denial of relief

for a new guilt phase, and we also deny the claims in Braddy's petition for a writ

of habeas corpus with the exception of his claim for relief under Hurst v. Florida.

Accordingly, we vacate the death sentence and remand this case for a new penalty

phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY, J., concurs in part and dissents in part with an opinion, in which
POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

LAWSON, J., concurring specially.

See Okafor v. State, No. SC15-2136, slip op. at 15 (Fla. June 8, 2017)

(Lawson, J., concurring specially).

CANADY, J., concurring in part and dissenting in part.

I agree with the decision to affirm the denial of relief on Braddy's guilt

phase claims.  But I disagree with the decision to vacate Braddy's death sentence

and to remand for a new penalty phase. As I have previously explained, <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016), should not be given retroactive effect. <u>See</u> <u>Mosley v. State</u>, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part). I would also reject Braddy's other penalty phase claims. The postconviction court's denial of all relief should be affirmed. The habeas petition should be denied in full.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Miami-Dade County,
     Ariana Fajardo Orshan, Judge - Case No. 131998CF0377670001XX
And an Original Proceeding – Habeas Corpus

Neal A. Dupree, Capital Collateral Regional Counsel, William M. Hennis, III, Litigation Director, and Jessica Houston, Staff Attorney, Office of the Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

     for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Lisa A. Hopkins, Assistant Attorney General, Tallahassee, Florida,

     for Appellee/Respondent